FILED ENTERED
LODGED RECEIVED

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JUN 8 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES FOR AN )
ORDER AUTHORIZING THE INTERCEPTION )
OF VISUAL, NON-VERBAL CONDUCT )
AND ACTIVITIES BY MEANS OF CLOSED )
CIRCUIT TELEVISION OCCURRING )
WITHIN A 2006 28ft Ford Yellowstone SE )
Motor Home, model E-450 Super Duty )
Maryland tag ███████ )
VIN ████████████ )
_____ )

UNDER SEAL

Misc. No. __16mc361__

## APPLICATION FOR AN ORDER AUTHORIZING THE
## INTERCEPTION OF VISUAL, NON-VERBAL CONDUCT AND
## ACTIVITIES BY MEANS OF CLOSED CIRCUIT TELEVISION

A. Pursuant to Rule 41(b) of the Federal Rules of Criminal Procedure and the All Writs

Act (28 U.S.C. § 1651), the United States of America by and through Rod J. Rosenstein, United

States Attorney for the District of Maryland, and Leo J. Wise, an Assistant United States

Attorney for said District, hereby makes application to this Court for an order authorizing the

interception and recording of visual, non-verbal conduct and activities by means of closed circuit

television occurring within: **2006 28ft Ford Yellowstone SE Motor Home, model E-450 Super Duty**

**Maryland tag** ███████, **VIN** ████████████, **white in color with grey and black designs on**

**the sides and rear and the words Yellowstone SE on the sides, front and rear.** The factual basis for

the granting of this application is set forth in the attached affidavit of Special Agent Erika Jensen

of the FBI, which is incorporated by reference herein.

B. Also attached to this application is a letter from Jennifer A. H. Hodge, Deputy

Director, Office of Enforcement Operations, Criminal Division, United States Department of

2 cc/s
AUSA
6/8/16 JK

Justice, authorizing the making of this application for visual surveillance by means of closed circuit television. *See* Attachment A.

    C. The attached affidavit of SA Jensen, *see Attachment B*, reflects that there is probable cause to believe:

    1. The Target Location known as **2006 28ft Ford Yellowstone SE Motor Home, model E-450 Super Duty Maryland tag** ███████ **, VIN** ████████████ **white in color with grey and black designs on the sides and rear and the words Yellowstone SE on the sides, front and rear (hereafter the "Target Location"),** are being and will continue to be used by Momodu Bondeva Kenton GONDO, a.k.a. Momodu GONDO, "GMoney," and "Mike;" Jemell Lamar RAYAM (hereafter the "Target Interceptees") and others as yet unknown, to commit offenses involving theft of government property in violation of Title 18, United States Code Section 641 and obstruction of justice, in violation of Title 18, United States Code, Section 1512 and 1519 (hereafter the "Target Offenses").

    2. The visual, non-verbal conduct and activities of the above-named individual(s) will be obtained through interception by means of closed circuit television at these Target Location and that such conduct and activities will provide:

    a. information indicating the precise nature, scope, extent and methods of operation of the participants in the illegal activities referred to above,

    b. information reflecting the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in the illegal activities referred to above, and

    c. admissible evidence of commission of the offenses described above.

    3. Normal investigative procedures have been tried and failed or reasonably appear unlikely to succeed, if tried, or appear to be too dangerous to employ.

4. On the basis of the attached affidavit of SA Jensen and allegations contained in this application,

IT IS HEREBY REQUESTED that this Court authorize Special Agents of the FBI to intercept and record by means of closed circuit television visual, non-verbal conduct and activities of the Target Interceptees and others as yet unknown at the Target Location, concerning the Target Offenses.

IT IS REQUESTED FURTHER that such interception not automatically terminate when the type of visual, non-verbal conduct described above has first been obtained but continue until conduct is intercepted that reveals: (1) the manner in which the above-named described offenses are being committed; (2) the precise nature, scope, and extent of the above-described offenses, and, (3) the identity and roles of accomplices, aiders and abettors, co-conspirators, and participants, or for a period of eight (8) days from the date of this order, whichever is earlier.

IT IS REQUESTED FURTHER THAT this order require that it be executed as soon as practicable and that interception be conducted in such a manner as to minimize interception of visual, non-verbal conduct which is not criminal in nature, and that the order terminate upon attainment of the authorized objectives or at the end of eight (8) days from the date of the order, whichever is earlier.

IT IS REQUESTED FURTHER that surveilling agents be authorized to spot monitor the Target Location to ascertain whether any of the aforementioned persons are present inside the Target Location. When such persons are found to be present, the agents will continue the interception as to conduct that involves the designated offenses.

When it is determined that none of the named interceptees nor any person subsequently identified as an accomplice who uses the Target Location to commit or converse about the

designated offense(s) is inside the Target Location, interception of visual, non-verbal conduct will be discontinued.

IT IS REQUESTED FURTHER that, in accordance with 18 U.S.C. 3103a(b), this Court's order delay notification of the execution of the order for a period not to exceed ninety days (or some lesser period) because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation. Such period of delay may thereafter be extended by the court for good cause shown.

Dated: June 7, 2016

Respectfully submitted,

Leo J. Wise
Assistant United States Attorney

# ATTACHMENT A



**U.S. Department of Justice**

Criminal Division

---

*Washington, D.C. 20530*

JUN 0 7 2016

The Honorable Rod J. Rosenstein
United States Attorney
District of Maryland
Baltimore, Maryland

Attention:    Leo J. Wise
              Assistant United States Attorney

Re:   Rule 41(b) FRCP (Video Surveillance)
      occurring within and in the vicinity of 2006
      28 ft Ford Yellowstone SE Motor Home, model
      E-450 Super Duty Maryland tag ████ , VIN
      ██████████ , white in color with grey
      and black designs on the sides and rear and
      the words "Yellowstone SE" on the sides,
      front and rear, which is under the custody
      and control of the Federal Bureau of
      Investigation.

Dear Mr. Rosenstein:

   By virtue of authority delegated to me by the Attorney
General in Department of Justice Order No. 985-82, dated
August 6, 1982, you are hereby authorized to apply for and
obtain a court order permitting the use of video surveillance in
the above investigation.

   The application and order are to be based on Rule 41(b) of
the Federal Rules of Criminal Procedure and the All Writs Act
(28 U.S.C. § 1651).  The application and order should be based
on an affidavit that establishes probable cause to believe that
evidence of a federal crime will be obtained by the surveillance
and should include:  (1) a statement indicating that normal
investigative procedures have been tried and failed or
reasonably appear to be unlikely to succeed if tried or to be
too dangerous; (2) a particularized description of the premises
to be surveilled; (3) the names of the persons to be surveilled,
if known; (4) a statement of the steps to be taken to assure

that the surveillance will be minimized to effectuate only the purposes for which the order is issued; and (5) a statement of the duration of the order, which shall not be longer than is necessary to achieve the objective of the authorization nor, in any event, longer than thirty days.  See United States v. Koyomejian, 970 F.2d 536 (9th Cir. 1992)(en banc); United States v. Cuevas-Sanchez, 821 F.2d 248 (5th Cir. 1987); United States v. Biasucci, 786 F.2d 504 (2d Cir.), cert. denied, 479 U.S. 827 (1986); United States v. Torres, 751 F.2d 875 (7th Cir. 1984), cert. denied, 470 U.S. 1087 (1985).

The video surveillance order should not be incorporated into an order for electronic surveillance pursuant to 18 U.S.C. § 2518. In the event the video surveillance order is being filed in conjunction with an electronic surveillance order pursuant to 18 U.S.C. § 2518, the affidavit used in support of the latter order may, where appropriate, also be used in support of the separate video surveillance order.

Sincerely,

Jennifer A. H. Hodge
Deputy Director
Office of Enforcement Operations
Criminal Division

JUN 0 7 2016

# ATTACHMENT B

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | <u>UNDER SEAL</u> |
| OF THE UNITED STATES FOR AN | ) | |
| ORDER AUTHORIZING THE INTERCEPTION | ) | |
| OF VISUAL, NON-VERBAL CONDUCT | ) | Misc. No. _____ |
| AND ACTIVITIES BY MEANS OF CLOSED | ) | |
| CIRCUIT TELEVISION OCCURRING | ) | |
| WITHIN A 2006 28ft Ford Yellowstone SE | ) | |
| Motor Home, model E-450 Super Duty | ) | |
| Maryland tag █████████ | ) | |
| VIN ████████████████ | ) | |

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR ORDER AUTHORIZING INTERCEPTION OF NON-VERBAL CONDUCT</u>

I, Erika Jensen, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state that:

### <u>BACKGROUND OF AFFIANT</u>

Erika Jensen, being duly sworn, deposes and states as follows:

1.      I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since July of 2004.   From January 2005 through May 2009, I was assigned to a Drug Squad in the Chicago Field Division.   In connection with my official FBI duties, I investigated criminal violations of the Controlled Substances Act.   I have received specialized training in the enforcement of federal narcotics laws, and I have been involved in all aspects of narcotics

1

trafficking investigations, including (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking; (b) surveillance; (c) authoring and/or participating in numerous search warrants; and (d) analysis of documentary and physical evidence.    I have also received training and participated in investigations involving the interception of both wire and electronic communications.    From June 2009 until September 2012, I was a member of the Attorney General's Protection Detail in Washington, DC.    During this assignment, I functioned as a protection agent for the Attorney General of the United States.    From September 2012 until June 2015, I was assigned to a HIDTA Safe Streets Task Force at the Baltimore Field Office of the FBI which investigates violations of federal drug, gang, and firearms statutes.    I was responsible for investigations involving unlawful activities to include gangs/criminal enterprises, prison corruption and racketeering, firearms offenses, and violent crimes to include homicide.    From June 2015 until present, I have been assigned to a Public corruption squad in Baltimore and have been conducting investigations on mail and wire fraud, violations of anti-trust laws, and bribery and extortion.

3.    Since 2004, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, narcotics, and various other crimes.    I have also testified in judicial proceedings and prosecutions for violations of federal narcotics laws and federal racketeering laws.    In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.    In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: the analysis of large amount of

2

documentation including banking records, email, and corporate contracts; the analysis of

extraction reports generated from the contents of telephones; interviewing informants, witnesses,

and defendants; conducting physical surveillance; conducting homicide investigations;

consensual monitoring and recording of both telephonic and non-telephonic communications;

analyzing telephone pen register and caller identification system data; conducting

court-authorized Title III wiretap investigations; and preparing and executing search warrants

that have led to seizures of documents, bank records, narcotics, firearms, and other contraband.

I have also become familiar with the terminology and codes used by narcotic suppliers to thwart

detection by law enforcement.

## PURPOSE OF THE AFFIDAVIT

4.      This affidavit is submitted in support of an application for an order authorizing

the interception of, pursuant to Rule 41 and the All Writs Act, 28, United States Code, Section

1651, visual non-verbal conduct of Momodu Bondeva Kenton GONDO, a.k.a. Momodu

GONDO, "GMoney," and "Mike;" Jemell Lamar RAYAM; ███████ ███████; and others

as yet unknown (hereinafter the "Interceptees"), occurring within and in the vicinity of **a 2006**

**28ft Ford Yellowstone SE Motor Home, model E-450 Super Duty Maryland tag** ███████

**VIN** ███████████, **white in color with grey and black designs on the sides and**

**rear and the words Yellowstone SE on the sides, front and rear,** which is in the custody and

under the control of the FBI (hereinafter the "Target Location") between June 8, 2016 and June

15, 2016, concerning offenses including theft of government property in violation of 18 U.S.C. §

641 and obstruction of justice, in violation of Title 18, United States Code, Section 1512 and 1519

(hereinafter referred to as "Target Offenses").   Specifically, the FBI is planning a law

enforcement operation in which the Target Location, a recreational vehicle, will be rented by the

3

FBI, equipped with audio and video recording devices and parked in a public location within the

Baltimore city limits.   In addition, approximately $4,500 in pre-recorded bait money will be

comingled with personal items and placed inside the Target Location to appear as if someone

had recently traveled out of state in the Target Location, perhaps to secure drugs and/or guns,

and that they had returned with these items and distributed them in around the Baltimore area.

A ruse call will be placed by County investigators to the GTTF, and if possible, directly to

RAYAM or GONDO requesting assistance securing and searching the Target Location.   The

ruse will involve County investigators advising the GTTF about a fictitious narcotics related take

down that resulted in information about the Target Location and possible guns and drugs to

include that they have someone in custody who is cooperating, this person is reporting that they

have a vehicle, the Target Location, parked at a truck parking area at a rest stop off of Interstate

95 in Baltimore, this person has given consent to search the vehicle, and there is a key hidden

under the bumper.   No undercover personnel or informants will be present in or around the

Target Location.   County investigators will advise the GTTF to secure any evidence recovered

at the Baltimore Police Department's Evidence Control Unit and that County Investigators will

retrieve the vehicle.   If the money is taken, no arrests will be made.

   5. As a result of my personal participation in this investigation and through

information and reports obtained from other federal, state and local law enforcement agents, I am

familiar with all aspects of this investigation.   On the basis of this familiarity, and on the basis

of other information that I have reviewed and determined to be reliable, I believe the following:

   (a) There is probable cause to believe that Momodu Bondeva Kenton GONDO, a.k.a.

    Momodu GONDO, "GMoney," and "Mike;" Jemell Lamar RAYAM and others as

    yet unknown (hereinafter the "Target Subjects") have committed, are committing,

4

and will continue to commit the following offenses: theft of government property

in violation of Title 18, United States Code Section 641 and obstruction of justice,

in violation of Title 18, United States Code, Section 1512 and 1519 ("Target

Offenses");

6.      Additionally, based upon the investigation in this case, there is probable cause to

believe the following:

(a)     the **Interceptees** will use the Target Location in connection with the commission

of the Target Offenses;

(b)     particular visual non-verbal conduct of the **Interceptees** and others unknown,

concerning the Target Offenses will be obtained through the interception of

visual, non-verbal conduct within the Target Location; and,

(c)     the visual, non-verbal conduct will likely identify and provide admissible

evidence concerning:

(i) the Target Offenses;

(ii) the nature, extent, and methods of the criminal organization in which
the **Interceptees** and others as yet unknown participate; and

(iii) the subsequent concealment, distribution, and transfer of contraband
and proceeds from these illegal activities.

7.      Normal investigative procedures have been tried and have failed, reasonably

appear to be unlikely to succeed if tried, or will be too dangerous, as described herein in further

detail.

## BASIS OF INFORMATION

8.      I make this Affidavit based upon personal knowledge derived from my

participation in this investigation and upon information I believe to be reliable from the

5

following sources:

    a.  my experience investigating criminal enterprises including gang and drug trafficking
        organizations;

    b.  oral and written reports about this investigation that I received from Special Agents of
        the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA),
        and Internal Revenue Service (IRS), and Officers from the Baltimore County Police
        Department (BCPD), the Harford County Sherriff's Office (HCSO), and the Baltimore
        City Police Department (BPD);

    c.  physical surveillance conducted by the FBI, DEA and local law enforcement agencies,
        the results of which have been reported to me either directly or indirectly;

    d.  the review of telephone toll records and pen register data;

    e.  the review of bank records and travel information obtained from Grand Jury
        subpoenas;

    f.  court authorized GPS data;

    g.  court authorized interceptions of wire communications;

    h.  recorded telephone calls made by inmates in Federal prisons and the Maryland state
        prison system;

    i.  and from the review of reports of debriefings of sources of information and other
        witnesses.

    9.     Since this Affidavit is being submitted for the limited purpose of securing

authorization for the interception visual non-verbal conduct, I have not included each and every

fact known to me concerning this investigation.   I have set forth only the facts that I believe are

necessary to establish the necessary foundation for an order authorizing the interception of visual

non-verbal conduct.    Nor do I request that this Court rely upon any facts not set forth herein in

reviewing this affidavit in support of the Application for the interception of visual non-verbal

conduct.

## CRIMINAL HISTORIES AND IDENTIFIERS FOR TARGET SUBJECTS

    10.    Information about the Target Subjects comes from the National Crime Information

Center (NCIC).    Through a review of that information, the following persons have been

identified:

    a.    Momodu Bondeva Kenton GONDO, aka Momodu GONDO, "GMONEY" and

"MIKE," is a male who was born on ███████████ with a Social Security

Number ████████ Maryland Vehicle Administration ("MVA") records

indicate that GONDO's residence is ████████████████████

███████ Through this investigation however, investigators believe this is his

family/parent's residence and that GONDO actually resides at ███████████

████████████████████ GONDO is currently an active duty

Baltimore Police Department Officer (hereinafter "BPD").    According to BPD

records, GONDO has been assigned to BPD's Operational Intelligence Section

(OIS), specifically the Gun Trace Task Force (GTTF[1]) since April of 2013.

GONDO has no criminal history.

---

[1] The Gun trace Task force (GTTF) is a specialized unit within the Operational Intelligence
Section (OIS) of the Baltimore Police Department.    The GTTF is comprised of a Sargeant and
several Detectives and their primary mission is the tracking and tracing of recovered firearms in
order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within
Baltimore City.    In February 2015, BPD issued a policy that for any police action that results in
the recovery of a firearm, the GTTP duty detective is to be notified.

b.   Jemell Lamar RAYAM is a male born on ███████, with a Social Security

Number ████████ MVA records indicate that RAYAM's residence is ████

████████████████████████ RAYAM is an active

duty BPD Officer and has also been assigned to OIS/GTTF since April of 2013.

RAYAM has no criminal history.

c.   ████████████████ is a male born on ████████, with a Social

Security Number of ████████ MVA records indicate that ████████

residence is ████████████████████████ is

an active duty BPD Office and has been assigned to OIS/GTTF since July 2014.

████████ has no criminal history.

d.   Antonio SHROPSHIRE, aka "Brill" is a male born on ████████ who

resides at ████████████████████ SHROPSHIRE is

involved in drug trafficking and is associated with GONDO.   SHROPSHIRE's has

been arrested numerous times for between 2002 and 2014 and his charges include

weapons violations, narcotics violations, armed robbery, attempted first degree

murder, and assault.

e.   Glenn WELLS is a male born on ████████ and believed to reside at

████████████████████ WELLS is part of

SHROPSHIRE's drug trafficking organization and associated with GONDO.

WELLS has been arrested numerous times and his charges include: weapons

violations and narcotics violations.

## PRIOR APPLICATIONS TO INTERCEPT ELECTRONIC AND WIRE COMMUNICATIONS

7.      On March 8, 2016, the Honorable Richard D. Bennett, United States District Judge, District of Maryland, authorized the interception of wire and electronic transmissions over cellular telephone numbers (443) 571-8425 (**Target Telephone 2**) used by SHROPSHIRE, THOMAS and others and (404) 644-7734 (**Target Telephone 4**) used by SHROPSHIRE.   On April 7, 2016, both **Target Telephone 2** and **Target Telephone 4** were extended for an additional thirty days. WELLS and SHROPSHIRE were listed as Target Subjects in the affidavit.   The current authorization expired on May 6, 2016.

8.      On March 24, 2016, the Honorable Richard D. Bennett, United States District Judge, District of Maryland, authorized the interception of wire and electronic transmissions over cellular telephone number (443) 960-1943 (**Target Telephone 5**), used by Antonio SHROPSHIRE.   WELLS and SHROPSHIRE were listed as Target Subjects in the affidavit. This authorization and interceptions ceased on April 21, 2016.

9.      On April 28, 2016, the Honorable Richard D. Bennett, United States District Judge, District of Maryland, authorized the interception of wire communications over cellular telephone number (443) 513-1994 (**Target Telephone 13**), used by GONDO.   The target interceptees were GONDO, RAYAM, ▮▮▮▮▮ SHROPSHIRE, WELLS, and ▮▮▮▮▮ ▮▮▮▮▮ On May 27, 2016, an additional thirty days were authorized for **Target Telephone 13** for wire communications and authorization was added for electronic communications. Interceptions are ongoing will expire on June 25, 2016.

9

## FACTS ESTABLISHING PROBABLE CAUSE

10.     In this affidavit, I seek authorization to initiate interception of visual, non-verbal conduct within the Target Location in order to further uncover the scope of the criminal conduct of the members of the GTTF, in particular, GONDO and RAYAM.    The interception of visual, non-verbal conduct within the Target Location will be during a discreet time period controlled by the FBI and based upon a ruse scenario.    Specifically and under the ruse, GONDO and RAYAM will be provided background information about an investigation involving the Target Location and asked to secure and conduct a search of the Target Location on behalf of another agency.    A sum of United States currency will be placed in the Target Location by the FBI.

### Drug Investigation, Discovery of Unknown GPS Device, and Information about a Home Invasion

12.     In 2013, The Harford County Narcotics Task Force began an investigation into the source of heroin in Harford County after a series of fatal and non-fatal heroin overdoses. Investigators determined that a large amount of the heroin being sold in Harford County was being obtained from two narcotics traffickers in northern Baltimore City, Maryland.    These men were identified as Antonio SHROPSHIRE aka "Brill" and Aaron ANDERSON aka "Black." Source information and interviews with cooperating individuals reflected that SHROPSHIRE and ANDERSON tolerated each other's presence, and may have even purchased heroin from each other on occasion.    Confidential informants further advised that sometime in early 2015, tensions between these competing entities grew.    It is believed that at some point, ANDERSON acquired a higher quality heroin source than SHROPSHIRE and some of SHROPSHIRE's customers started to buy heroin from ANDERSON instead of SHROPSHIRE.    Specifically, in

10

February 2015, a confidential source who knows both ANDERSON and SHROPSHIRE

purchased a quantity of narcotics from ANDERSON.   According to this source, SHROPSHIRE

was upset with the confidential source for buying narcotics from ANDERSON.

13.   On July 20, 2015, Harford County investigators and Baltimore County

investigators (hereinafter "County investigators"), installed and began monitoring a court

authorized GPS device on ANDERSON's vehicle, a 2015 Jeep Cherokee (hereinafter

"Anderson's vehicle").

14.   On October 19, 2015, ANDERSON was arrested and search warrants were

executed on ANDERSON's vehicle, on a hotel room at the Red Roof Inn in Timonium,

Maryland, and on ANDERSON's residence at 2835 Marnat Road, Apartment E, Baltimore,

Maryland (hereinafter "ANDERSON's residence").   During the search of ANDERSON's

vehicle, County investigators went to retrieve their GPS device from under ANDERSON's

vehicle.   County investigators also discovered and removed a second GPS device on the

undercarriage of ANDERSON's vehicle.

15.   This second GPS device was determined to be a Live View PT-10 PRO GPS

tracker.   In response to a Grand Jury subpoena, Live View provided records reflecting that █████

█████████ purchased this device on September 22, 2015.   As described above, █████████ is a

sworn member of the BPD, assigned to the GTTF with GONDO and RAYAM, but he purchased

the device with a personal credit card for $436.86 and had it shipped UPS Next Day Air to his

home.   Live View records also revealed that earlier, on April 30, 2015, █████████ had

purchased the same model GPS device as the one he bought in September, and also had it

shipped to his home address.   █████████ was billed $394.18 and paid with his personal credit

card.   Your affiant has no information as to the location of the GPS device purchased in April

by ███████  ███████ was also billed $44.90 monthly between May and September 2015

for a monthly subscription and an iPhone application to "live track" the data from the April GPS

device.   On September 23, 2015, he paid 11.92 to also live track the September purchased

device.   According to Live View, in October 2015, ███████ requested that the tracking

subscriptions be canceled because he was no longer using the device.

  16. Your affiant knows from experience that anyone tracking that second GPS device

found by County investigators on ANDERSON's vehicle knows that it stopped signaling its

location at or near the vicinity of the Baltimore County Police Cockeysville precinct on October

19, 2015, when ANDERSON was arrested.   To date, there have been no inquiries by anyone

seeking to recover this GPS.   Also significant are other unusual aspects of law enforcement

standard operating procedures.   In approximately April or May 2015, County investigators had

entered ANDERSON's name, identifiers, and ANDERSON's vehicle into a deconfliction

database.   If another law enforcement agency had previously entered ANDERSON or his

vehicle into the database, the County investigators would have been advised so that the two

investigating agencies could coordinate.   The first group of investigators would also have been

notified that an inquiry was made on their target.   Between the day of the entry in April or May

of 2015, through May of 2016, no deconfliction notices have been received by County

investigators.   Specifically, County investigators have never been contacted by ███████ or

any law enforcement agency regarding ANDERSON or the GPS.

  17. Further attempts were made to determine if this second GPS device was placed on

ANDERSON's vehicle lawfully and in furtherance of an official law enforcement investigation.

These efforts are as follows:

a.  Your affiant knows that when law enforcement initiates an investigation on a subject,
    they will typically run the subject's criminal history in the National Crime
    Information Center (NCIC) database.   This database is maintained in Maryland by
    the Maryland State Police (MSP).    MSP can not only tell who has been queried, but
    they can also tell who has conducted the query.   Each user has a specific logon and it
    is a violation of NCIC to use anyone else's logon.   MSP has confirmed that as of
    November 18, 2015, ANDERSON was queried ten times by BPD personnel between
    February 13, 2015 and April 10, 2015.   These queries were conducted by four sworn
    BPD members assigned to the Regional Auto Theft Task Force (RATT), and once by
    a BPD dispatcher.   There is no record of any queries by GONDO, RAYAM,
    █████████ or any other member of the GTTF.

b.  Your affiant also knows that when conducting an investigation on a subject, BPD
    officers will typically query the subject in a BPD database that allows them to view
    arrest history including the charges, probable cause statement, booking photographs,
    and identifiers of the arrestee.   On December 22, 2015, your affiant determined that
    for the years 2014 and 2015, ANDERSON was queried by numerous sworn BPD
    employees, but never by █████████ RAYAM or GONDO.   Your affiant further
    determined that █████████ RAYAM and GONDO conducted numerous queries
    during this period presumptively on subjects of their investigations, but never on
    ANDERSON's name, date of birth or state identification number (SID).

c.  Finally, BPD officers are required to enter any search warrants they obtain, including
    those for GPS devices, into a BPD database.   On December 9, 2015, a query of that
    database revealed several warrants in 2015 listed by █████████ RAYAM and

13

GONDO, but none were of ANDERSON's name, DOB, vehicle or known residences associated with ANDERSON.

18.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   As indicated, County investigators executed a search

warrant at an apartment believed to be his residence on Marnat Road, and at a hotel room.

When ask why ANDERSON and his girlfriend (T'Ana Cousin) were living in a hotel room, he

advised that approximately a week or two earlier, there had been a home invasion robbery at the

Marnat Road apartment.   This apartment was leased to Cousin, and she was alone at time of

the robbery.   Cousin called ANDERSON after the two masked men left and ANDERSON

returned to the apartment.   ANDERSON searched the apartment and determined that the

robbers had taken approximately $12,000 in cash and a Rolex watch.   The police were never

called.

19.   In an effort to follow up on this robbery and to corroborate information from

ANDERSON, the FBI interviewed T'Ana Cousin on March 24, 2016. According to Cousin, she

moved into the residence at 2835 Marnat Road, Apartment E, Baltimore, Maryland in December

2014.   She described the home invasion.   Cousin was in bed watching television and believes

it was around two or three o'clock in the afternoon.   Cousin cannot recall if ANDERSON had

stayed with her the night before, but she believed at that time he was at the mall in Towson.

Cousin heard running on the stairs outside of her apartment, a "boom," and then it sounded like

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14

someone was in her apartment.   Cousin asked who was there and then an unknown black male

appeared in her room and stated, "You know what this is!"   The unknown black male told her

to lay on the bed face down and asked her where the money was.   Cousin attempted to remove

her jewelry and the unknown male said, "I don't want that shit."   The unknown male again

asked where the money was and Cousin told him several times that she didn't know what he was

talking about.   Cousin then heard the unknown make talking to a second male.   Cousin started

to panic and asked them not to kill her.   The unknown male bent down and held his finger to his

lips and said he wasn't going to hurt her that he just wanted the money.   Although the unknown

male was mostly covered by gloves and a ski mask, Cousin observed that he was a light-skinned

black male and was not skinny, but rather "thick boned."   Just before they left, the unknown

male asked Cousin if she was going to call the police, to which she replied she would not.   At

no time did Cousin ever see a weapon.   After they left, Cousin stayed on her bed for a few

minutes until she felt safe.   Cousin then called ANDERSON who took about twenty to

twenty-five minutes to return to the apartment.   Anderson and Cousin stopped staying at the

apartment and started staying at hotels.

20.   In an effort to identify the date of the home invasion, County investigators

reviewed the data from the GPS that was installed by them on ANDERSON's vehicle – which

was removed on the date of his arrest on October 19, 2015, along with the second mystery GPS.

The data reflected that on October 5, 2015, at approximately 12:40 pm, ANDERSON's vehicle

departed Marnat Road.   At approximately 5:50 pm, ANDERSON's vehicle traveled away from

the Loch Raven/Alameda area of Baltimore and traveled to the Towson Mall area.   At

approximately 7:05 pm, ANDERSON's vehicle was in the vicinity of the White Marsh Mall

when it departed that location traveled at a speed of over 75 miles per hour back to the

15

apartment. Also according to the GPS data, the first night that ANDERSON's vehicle remained overnight at a hotel, was October 5, 2015. Your affiant believes that the home invasion occurred on October 5, 2015, before 7:05 p.m. Your affiant further believes that Cousin alerted ANDERSON at that time causing ANDERSON to respond quickly back to the residence.

## SHROPSHIRE, WELLS, RAYAM, and GONDO

21.     In December 2015, your affiant interviewed a sworn BPD Officer (hereinafter "Officer-1").[3] Officer-1, who is currently a sworn member of the BPD, used to be in a position to observe both GONDO and RAYAM in the work place in approximately 2013. Officer-1 is also familiar with SHROPSHIRE as an established drug trafficker in Baltimore City through Officer-1's work investigating drugs. On one occasion Officer-1 was at a restaurant in Baltimore where Officer-1 observed both GONDO and SHROPSHIRE also in the restaurant. Much to Officer-1's surprise, GONDO introduced SHROPSHIRE to Officer-1 as "his brother." There was a moment of tension based on Officer-1's knowledge of SHROPSHIRE. At that time GONDO assured SHROPSHIRE that Officer-1 was "cool." Officer-1 was upset that GONDO vouched for Officer-1 to SHROPSHIRE in that way. Officer-1 changed assignments and has not had contact with GONDO since approximately 2013. Your affiant believes Officer-1's motivation to come forward with the information was based on his employment obligation to report his suspicions of inappropriate behavior and further your affiant believes Officer-1 to be reliable. Officer-1 does not have any criminal history.

22.     Officer-1 provided two telephone numbers for GONDO that were still in Officer-1's contact list on his telephone, (443) 255-0600 and (443) 255-8819. Since Officer-1

---

[3] This Officer had originally come forward with similar information in 2013, including that GONDO and RAYAM were taking money and stealing drugs during traffic stops while on duty.

16

has not had any contact with GONDO since 2013, Officer-1 was unsure if they were still valid.

Your affiant knows that (443) 255-0600 and (443) 255-8819 were used by GONDO through

December 2015.   Officer-1 further advised that GONDO referred to himself as "GMoney."

GONDO had told Officer-1 that GONDO partied with SHROPSHIRE and that they frequented

the clubs in Washington D.C. together.   Officer-1 believes that GONDO and SHROPSHIRE

grew up together.   Officer-1 also advised that Officer-1 knows an individual named Glenn

WELLS (WELLS) who lives near The Alameda. Wiretaps conducted by County investigators

confirmed that WELLS distributes heroin for SHROPSHIRE in that vicinity.   Officer-1 recalled

that WELLS' residence was not far from GONDO's father.   Your affiant has confirmed that

WELLS' family home and GONDO's family home, the locations where WELLS and GONDO

are believed to have grown up, are around the corner from each other.   The backyards of the

respective residences almost connect.   GONDO once mentioned to Officer-1 that GONDO and

WELLS were friends.

     23.     Your affiant also searched GONDO's records for two telephone numbers that your

affiant knows to have been used by SHROPSHIRE (240-490-6101 and 443-787-9071).

Between October 11, 2015 and January 1, 2016, (81 days) your affiant observed 99 telephone calls

between the telephones used by GONDO and SHROPSHIRE.   This is more than one telephone

contact per day.   Between July 2, 2015 and January 1, 2016, there were 316 contacts between

GONDO's telephones and a telephone associated with WELLS (443-622-1418).

     24.     Investigators have also obtained records for calls and text messages for the

telephone used by RAYAM (442-314-3621) for the time period January 1, 2013, through January

4, 2016.   A review of these records reflect no calls to SHROPSHIRE, but did reflect 12 calls to the

telephone associated with WELLS (443-622-1418) during the 30 days between October 3, and

November 2, 2015.   Your affiant has confirmed that neither SHROPSHIRE, nor WELLS are

registered as BPD confidential informants.   Moreover there is no record of them being

confidential informants going back at least five years.

       25.     Your affiant also reviewed the telephone toll records for GONDO's previous

telephone numbers ((443) 255-0600 and (443) 255-8819) and for RAYAM's telephone number

(442-314-3621) captured on October 5, 2015, the day when your affiant believes the home

invasion robbery at Cousin's apartment occurred.   Your affiant observed the following:

a) There are numerous activations between GONDO's telephone (443) 255-8819
   and RAYAM's telephone throughout the day.

b) There were numerous contacts in the morning and afternoon between GONDO and
   the WELLS telephone number (443) 622-1418.   While this was the period of time
   when GONDO was having fairly regular contacts with this number, on this day,
   there was a spike in the number of contacts on that day.

c) At approximately 2:49 pm, and again at approximately 2:52 pm, RAYAM placed
   calls that were approximately 40 seconds in length and twelve seconds in length
   respectively to the WELLS telephone number (443) 622-1418.

d) At approximately 3:15 p.m. WELLS placed a call to GONDO that lasted
   approximately 40 seconds and then also at approximately 3:15 p.m., WELLS placed a
   call to RAYAM that lasted approximately two seconds.   Between 3:39 p.m. and 5:39
   p.m., GONDO and WELLS had approximately eight additional contacts.

e) At approximately 5:39 pm, GONDO placed a call that lasted approximately 40
   seconds to the WELLS telephone number, (443) 622-1418.   At approximately 6:21
   pm, 6:22 pm, and 6:23 pm, the WELLS telephone contacted GONDO.   The first two
   contacts had no duration and the third lasted four seconds.   At approximately 6:25
   pm, GONDO called the WELLS telephone that lasted nine seconds.

f) There are no outgoing calls or text messages from RAYAM's telephone between
   approximately 6:24 pm and 6:50 pm.

g) Between approximately 6:38 pm and 6:50 pm there were no calls to or from
   GONDO's telephones.   Because of the type of service on GONDO's telephones, text
   messaging activity cannot be determined for GONDO's phone.

h) Starting at approximately 6:50 pm, GONDO called RAYAM, using (443) 255-8819, and then at approximately 6:54 pm, GONDO called RAYAM again but used his other telephone, (443) 255-0060.

i) At approximately 8:59 pm, GONDO placed a call that was approximately 25 seconds in length to the WELLS telephone number (443) 622-1418.

j) After the contacts at 6:50 and 6:54 pm, there were no contacts between RAYAM and GONDO until just before midnight. Around midnight there are two short contacts from RAYAM to GONDO, one approximately twenty seconds in length and the other approximately six seconds in length.

26.     A check of the BPD employee time records revealed that both GONDO and RAYAM worked an 8:00 AM to 4:00 pm shift on October 5, 2015.

27.     On October 6, 2015, GONDO completed a counter credit deposit into his personal Bank of America bank account in the amount of $8,545, of which $5,540 was in cash. Two days later, on October 8, 2015, GONDO completed another counter credit deposit into his personal bank account in the amount of $11,101.00, of which $10,500 was cash.

28.     On October 6, 2015, an ATM cash deposit was made in the amount of $1,200 into a PNC account under the name of ███████ Rayam and Jemell L. RAYAM. In addition, on October 8, 2015, four separate ATM cash deposits were made into the same account totaling $6,000. Lastly, on October 13, 2015, an ATM cash deposit was made in the amount of $1,400 into the same account and RAYAM completed a $3,000 cash deposit with a teller the same day into the same account.

29.     According to BPD records, RAYAM reported an address change on July 11, 2011, reflecting his new address at 2835 Marnat Avenue, Apartment F, Baltimore, Maryland. ANDERSON's girlfriend's apartment was at the same address, Apartment E. Your affiant notes that there are only two apartments on the third floor at 2835 Marnat Road, Apartment E and Apartment F. According to Maryland Motor Vehicle Administration (MVA) records, in

19

April of 2015, approximately six months prior to the home invasion, RAYAM changed his

address to ███████████████████████████████████████████

   30.    On January 4, 2016, ███████████████ an associate of SHROPSHIRE, placed

an outgoing call from the jail to a telephone used by ████████ SHROPSHIRE's girlfriend.

During the call, SHROPSHIRE got on the telephone and spoke with████████.  During the call,

█████████ said, "I heard what's his name, I heard what's name got robbed."   SHROPSHIRE

asked who and ████████replied, "Black Aaron."   SHROPSHIRE said, "Oh yeah, ain't no

question. That's what I heard."   A little later in the call, ████████ said, "Oh, they said, they said

there was some papers.   That's what I heard" and SHROPSHIRE replied, "There was a nice ass

rollie in there, though."   ████████said, "Oh yeah.   They said that too."   Your affiant believes

that SHROPSHIRE and ████████were talking about the home invasion at ANDERSON's

residence and how whoever had done the robbery took "papers", meaning money, and a "rollie",

meaning a Rolex watch.   At a point in the conversation where ████████asked SHROPSHIRE

if he knew who did it, they both start laughing harder in a way that suggests they do know

exactly who did it.

   31.    Your affiant believes that SHROPSHIRE and/or WELLS alerted GONDO and

RAYAM to ANDERSON's location and provided information about ANDERSON's drug

trafficking activity in order to eliminate him as a competitor.   Your affiant further believes that

some time prior to early October 2015, GONDO, RAYAM, and possibly ████████ installed a

GPS tracking device on ANDERSON's vehicle in order to monitor his whereabouts unrelated to

their official duties.   Your affiant also believes that the information on the tracking device was

used by GONDO, RAYAM, SHROPSHIRE, and/or WELLS to coordinate and/or execute the

home invasion and robbery of ANDERSON's residence.

32.     Based on your affiant's knowledge, training and experience, the toll data between

GONDO, RAYAM, SHROPSHIRE and WELLS, the lack of any investigative queries by GTTF

personnel on ANDERSON, the discovery of ███████████ personal GPS device on

ANDERSON's car, and the absence of a tracking warrant authorizing the placing of that GPS,

the status of ANDERSON and SHROPSHIRE as not so friendly competition, and the details of

the home invasion at the apartment of ANDERSON's girlfriend, your affiant believes that

GONDO, RAYAM, ████████ and possibly others have utilized their law enforcement

positions to conduct illegal surveillance/investigations and to provide information to

SHROPSHIRE to further his drug enterprise.

### Wiretap Investigation on GONDO

33.     On April 28, 2016, this court entered an order authorizing the interception of wire

communications occurring to and from a telephone used by GONDO, **Target Telephone 13**, for

a period of thirty days. Interception is ongoing and authorization is set to expire on June 25,

2016.

11.     In this section, I summarize some of the pertinent calls intercepted on **Target
Telephone 13**.  For some of the calls summarized below, I have included in brackets my

understanding of what is being said during the call, based on the contents and context of the

conversations, my experience as a law enforcement officer and the experience of other law

enforcement officers in this investigation, including our experience listening to the intercepted

conversations as a whole.   The times listed for these calls are approximate.   In addition, all of the

voice identifications for the conversations set out below are preliminary.   In most cases, voice

identifications are based on names used during the intercepted conversations, voice recognition

that has been accomplished to date by law enforcement officers, historical information developed

21

during this investigation, and/or telephone subscriber information.   Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of the intercepted conversations.

12.   On May 4, at approximately 9:00 a.m., GONDO received an incoming telephone call from RAYAM who was using telephone number (443) 314-3621 (Session 394).   During the call, RAYAM asked, "Yo, you off today?" and GONDO said he was off.   RAYAM asked, "Um, whatchu got today anyway?" GONDO is unintelligible and then RAYAM said, "Hey, I may got somethin', um, I may got somethin' to where it may pan out.   The plan is, if I call you, then its worth for you to come in." GONDO replied, "Okay." RAYAM continued, "I know you got things going on, but feel what I'm sayin'." GONDO said, "Right. I got you." RAYAM chuckled and said, "Yeah, yeah, and then I may just have it to where it just me, you, and Sarge [Gondo and Rayam's Sergeant, Thomas Allers]. All right?" GONDO replied, "All right. I got you, yo." RAYAM continued, "You just, you just, meet me, um, you come and meet, and then you leave in thirty minutes.   You know what I mean?" Your affiant believes that RAYAM is setting up an enforcement operation and that RAYAM wanted GONDO to participate because he plans to steal money or narcotics from the search site.   Based on your Affiant's experience working in law enforcement and the tone and vagueness of their conversation, your Affiant believes that if RAYAM was discussing a legitimate police activity, he would speak openly about the details.

13.   On May 20, 2016, at approximately 1:50 p.m., GONDO used **Target Telephone 13** to call RAYAM at telephone number (443) 314-3621 (Session 1502).   During the call, GONDO said, "You know how we always said if we see, keep seein' the same car we gotta pull it over. Now I saw the Honda drivin' 83 [Interstate 83], ah, ah, south.   You feel me? I'm goin'

home, they goin' opposite way, yo, that same Honda Accord, yo." RAYAM replied, "You think it's following us?" GONDO responded, "No! I think it's out here doin' it's thing! Like they movin' like how we movin' [dealing drugs]." RAYAM said, "Hold on, you said what?" GONDO replied, "I said movin' like they workin' [selling drugs]." RAYAM said, "Oh they out there doin' shit [selling drugs], huh." GONDO replied, "Right. I shouldn't see the same car three times, yo. Two over east [east side of Baltimore], one downtown [downtown Baltimore] and I'm on 83, you know [unintelligible], I look at all the cars driving down the street. I'm going to Owings [Owings Mills, Maryland, the city GONDO lives in], coming back down towards downtown [and the Honda Accord is traveling south on I-83 toward downtown Baltimore]." RAYAM said, "That nigger makes some money, huh?" GONDO laughed and then said, "Yo, he [unintelligible] yo. Same car, yo. Tinted windows, burgundy plates, yo. Same car, yo." RAYAM said, "That's ballsy of him to come downtown, so he [the driver of the Honda Accord], he like, nobody pullin' me over in this car." GONDO and RAYAM discussed how they are going to stop the car next time they see it and GONDO commented, "I ain't supposed to see the same car three times, yo." Your affiant believes that GONDO had noticed a Honda Accord with tinted windows driving south on I-83 toward Baltimore as GONDO was driving north on I-83 toward home and believed it was the same vehicle that GONO had seen in some inner city neighborhoods in Baltimore. Your affiant further believes that because of the areas where GONDO had seen the vehicle, the after-market adjustments, and the frequency of his observations that the driver was involved in drug trafficking and that if GONDO and RAYAM conducted a traffic stop on the vehicle, they would likely seize illegal drugs, guns, and/or money and some or all of what they seize would be stolen by GONDO and RAYAM. Your affiant also believes that GONDO referenced "I think it's out here doin' it's thing! Like they movin' like how we movin'" is a

23

reference to drug trafficking and how GONDO and RAYAM are involved in drug trafficking. Your affiant also believes that RAYAM's first response was "You think it's following us?" demonstrates that RAYAM is concerned that they might be under investigation.

## GONDO References Money and Drugs

14.     On May 7, 2016, at approximately 4:18 a.m., GONDO placed a telephone call using **Target Telephone 13** to ███████, at telephone number (443) 854-5071 (Session 649). ███████ answered and GONDO, who was mumbling and slurring his words, said he loved her and asked where she was. ███████ replied that she just got her passport and was headed back "that way." GONDO said he would see her at the house and then ███████ asked, "Where did you go today?" GONDO replied, "I sell drugs. That's what I did today." ███████ said, "No you didn't. Where'd you go tonight?" GONDO, who was slurring his speech, responded, "I'm tellin' you what I did. ███████ I don't wanna lie to you. Why would I lie to you for?" ███████ asked, "Why would you sell drugs?" GONDO answered, "You already know what it is." ███████ said, "Ah. No" and GONDO continued, "But this (unintelligible) we talked in the morning." ███████ again asked, "Why are you selling drugs." After a pause, GONDO said, "Yes, ███████. I see you at the crib." ███████ said, "I don't get it. I just wanna a" and the call ends. Your affiant believes that GONDO was under the influence of either alcohol or drugs and had been out partying that night. Your affiant further believes that based on the tone of his voice that GONDO was being truthful with ███████ when he told her he sold drugs.

15.     On May 7, 2016, at approximately 5:35 a.m., GONDO placed an outgoing call using **Target Telephone 13** to an unknown male (UM1) at telephone number (410) 599-9958 (Session 658). During the call GONDO said, "I just got to the crib [home], yo" and UM1 laughed

and replied, "I dropped you off, yo." GONDO responded that UM1 didn't drop him off, but instead left GONDO. UM1 said, "No I didn't nigger, you fuckin' was standin' there outside the fuckin' car pissin' in front your fuckin' house." UM1 Asked if GONDO's girlfriend was home and GONDO said she was. GONDO continued to complain that UM1 walked off on him and added, "I had fuckin' 10,000 [$10,000 in cash] on me, yo." UM1 asked to speak to ███████and when ████████ got on the phone, UM1 told her to put GONDO to bed because he was drunk. ████████ asked UM1, "Where did you all go?" and UM1 replied, "We was in Baltimore around the way. Drinking with the homies." GONDO is heard in the background complaining that UM1 was talking to ████████ and ████████ can be heard saying to GONDO, "I'm askin' him what's going on, you are drunk, you sittin' here a drug dealer, don't be tellin' about no" and then into the telephone, "I'll talk to you later, thank you." UM1 said he would see them at the fight party and the call ended. Your affiant has reviewed location data for **Target Telephone 13** which revealed that GONDO had been in downtown Washington DC around 3:30 a.m. and then traveled back to Baltimore. Your affiant further believes that GONDO was upset with UM1 for leaving him in front of his residence because he was drunk and was carrying $10,000. GONDO's statement that he had $10,000 on him is made an hour after telling ████████ that he was a drug dealer.

### GTTF Law Enforcement Operation on May 11, 2016

16. On May 9, 2016, at approximately 2:21 p.m., GONDO placed a telephone call using **Target Telephone 13** to CI-1 at telephone number (410) 710-2097. (Session 747). During the call, GONDO asked, "We gonna be able to do that thing this week, yo? White boy?" CI-1 responded, "Yeah, uhm but the issue is I gotta get some, (unintelligible) get some bars [Xanax pills] first. Oh, no I don't." GONDO replied, "Right, because he aint gonna make it to you." Later in the conversation, GONDO said, "Yeah, set him up and make sure he has that shit [a gun] on

25

him." GONDO and CI-1 agreed to schedule the event to take place on Wednesday.   Your affiant believes that CI-1 is setting up to sell prescription pills to someone who will have a gun and that GONDO is planning on intercepting the person before they reach the informant.

17.     On May 9, 2016, at approximately 3:55 p.m. GONDO received an incoming telephone call on **Target Telephone 13** from CI-1 who called from telephone number (410) 710-2097 (Session 763). During the call CI-1 asked GONDO, "What time? Cause I told them I get them [the prescription pills] at 9:00 a.m. and I really need them to be, you know, come, when I need them to come because I need it for a bill." GONDO asked if it was for Tuesday or Wednesday and CI-1 responded that GONDO had said Wednesday.   CI-1 told GONDO, "They gonna have like, uhh, seven hundred dollars on them, he gonna have a 22 [a .22 caliber handgun], and he gonna bring me something. Him and his girlfriend." GONDO confirmed, "He gonna have a 22 and what else?"   CI-1 responded, "He bringin' me something [possibly a second gun]" and GONDO replied, "I got you."   CI-1 continued, "'Cause I told him I need something and he said I got you. Remember you heard the conversation."   GONDO said, "Yeah, yeah, yeah, I remember.   You showed me the text message. All right."   Investigators believe that CI-1 has arranged to sell the Xanax pills to an unknown individual at noon on Wednesday and that this individual would be carrying a .22 caliber handgun and $700.

18.     On May 11, 2016, at approximately 12:55 p.m. GONDO received an incoming telephone call on **Target Telephone 13** from CI-1 who called from telephone number (410) 710-2097 (Session 895).   During this call, CI-1 advised, "They here, I just seen 'em behind me. They got a green detail, see 'em?" GONDO acknowledged that he saw them and asked, 'You gonna see if you can see that for me?" CI-1 replied, "I already know it's [a gun] there. I know it's [a gun] there!" GONDO and CI-1 discussed where CI-1 was and the direction they were traveling.

CI-1 asked what GONDO wanted he/she to do and GONDO replied, "Just drive a little bit. We just wanna try to see if we get 'em for a violation real quick. Hope he don't signal right here." GONDO continued to direct CI-1 on where to drive and then said, "Don't use your blinker next time." GONDO told CI-1, "Just be drivin' down North Avenue for a little bit and be switching lanes." ▮▮▮▮ agreed. Your affiant believes that during this conversation, GONDO and other police officers were following CI-1 who was being followed by the people who were planning on buying Xanax pills from him/her. Your affiant further believes that GONDO and the other officers were trying to develop a legal reason to conduct the traffic stop in order to protect that CI-1 was a confidential informant.

19.    Four minutes later, at approximately 12:59 p.m., GONDO placed a telephone call using **Target Telephone 13** to CI-1 at telephone number (410) 710-2097 (Session 896). ▮▮▮▮ answered the telephone and said, "They like, there might be a cop a couple cars back." GONDO replied, "They said there might be a cop a couple cars back?" CI-1 continued, "Yeah. That's why I say you need to just get them." GONDO then directed CI-1, "I mean, go switch lanes real quick, switch lanes" and under his breath "they gonna signal." GONDO said, "go past them Sarge, you gotta go past them [GONDO is directing his Sergeant who may be diving the vehicle that GONDO was in]." After a few seconds with background noise that may have been a discussion, GONDO said, "So just pull them over?" After a few more seconds, CI-1 says something unintelligible and then GONDO asked CI-1 what CI-1 said. CI-1 responded, "Pull them over." GONDO replied, "Aright." The call ends just after 1:00 p.m.

20.    One minute later, at approximately 1:01:50 p.m., GONDO placed a telephone call using **Target Telephone 13** to CI-1 on telephone number (410) 710-2097 (Session 897). ▮▮▮▮ answered the telephone and GONDO said, "We got them pulled over. Were they saying anything

27

else? To you on the phone?" CI-1 replied, "Naw, only thing she basically said, the guy was like, it

look like some cops behind us so let's keep ridin" and "it's [a gun] in his right pocket, his jacket."

GONDO replied, "You saw that shit?" CI-1 replied, "Yeah, he carry it every time he come because

they come with so much money and they be scared. 'Cause he should have like six or seven

hundred dollars on 'em too. Then he supposed to be bringing me something, one." GONDO

replied, "Alright" CI-1 stated, "But yeah, he be thinking he gonna get robbed so that's why he

comes every time with it [a gun]." [Pause] GONDO stated, "Alright well they checked him, he, he

gotta grey T-shirt on. I don't see no jacket." COLE replied, "It's something in there, it's in there.

He's not gonna come without it." [Pause] GONDO stated, "He's shaking his head saying he ain't

got nothing [the officer who was with the male that was supposed to have the gun]." CI-1 replied,

"It's in that car, he never comes without it." [Pause] GOND replied, "They searched him, it ain't in

his pocket." CI-1 stated, "Well search the car, look under the seat." GONDO replied, "I know, we

gonna do that. We gonna do that." CI-1 and GONDO continued to discuss where the gun might

be and then CI-1 said, "Check the trunk because he was supposed to be bringing me one too

remember." Your affiant believes that during this call, GONDO informed CI-1 that they had

stopped the vehicle being driven by ██████████████ had searched the male passenger,

███████████████████, that ██████ only had a t-shirt on, and they had not yet

found the handgun. The call ended at approximately 1:04:26 p.m.

21. On May 18, 2016, your Affiant reviewed footage from a Baltimore Police

Department video surveillance camera located on a pole at the intersection of North Longwood

Avenue and West North Avenue. The camera was on an auto-rotation with a cycle of

approximately 50 seconds. Your affiant believes that while GONDO remained on the telephone

with CI-1, the following portions of the enforcement stop were captured by the camera with the

timestamps from the camera:

A.   At approximately 1:01:19 the camera swings up and faces west down North Avenue.   ███████ vehicle, driven by █████ and with██████████ as a passenger, is traveling in the right lane eastbound toward the camera and a second vehicle, believed to be occupied by ALLERS, HERSL, RAYAM, and GONDO begins to turn from the left lane to be behind the vehicle occupied by ██████ and ████████████   At approximately 1:01:24, the camera swings out of view.

B.   At approximately 1:02:07 p.m., the camera swings back into view and ██████████ vehicle is pulled over at the curb a few car lengths from the camera near the intersection of North Longwood Avenue.   At this time, ALLERS and HERSL and a female with dark hair and a dark jacket who our affiant believes is ████████ are interacting at the rear of ████████ vehicle.   A male wearing a police vest consistent with the size and shape of RAYAM and who your affiant believes is RAYAM is standing at the passenger side door of ██████████ vehicle. The vehicle that ALLERS, HERSL, RAYAM, and GONDO were in is immediately behind █████████ vehicle, positioned slightly offset and with emergency lights flashing.   GONDO is not visible and your affiant believes he is in the vehicle on the telephone with CI-1 at this time.   At approximately1:02:13, the camera again swings out of view.

C.   At approximately 1:02:55 p.m. the camera swings back into view and ███████████ is standing on the sidewalk by herself behind her vehicle.   There is a third vehicle now positioned behind the vehicle that GONDO is believed

29

to be in and ALLERS, HERSL, and the male believed to be RAYAM are all at the opened passenger side door of ████ vehicle. The camera again swings out of view.

D.   At 1:03:44 the camera once again swings into view. HERSL is now interacting with ████ a male wearing a light colored t-shirt believed to be ████ is standing just outside the passenger door of ████ vehicle and interacting with ALLERS, and RAYAM is positioned behind ████ with his back to the camera. Your affiant believes that the officers had just removed ████ from the vehicle and RAYAM was searching him. At approximately 1:03:49 p.m. the camera again swings out of view.

E.   At approximately 1:04:32 p.m. the camera again swings into view. Someone with a police vest is at the passenger side of ████ vehicle bent over and partially inside the vehicle, ████ is still standing on the sidewalk and there is at least one person standing with her only partially visible because of trees. No one else is in view of the camera.

22.   On May 11, 2016, at approximately 1:21 p.m. GONDO placed a telephone call using **Target Telephone 13** to CI-1 on telephone number (410) 710-2097 (session 899). GONDO informed CI-1 that, "We got, the ah, the small one, we don't see another one though [a second gun]." CI-1 responded, "Well he probably didn't bring me mine [a second gun]. Cause he supposed to bringin' me one. Yeah, but that's the one that he carry all the time, but 'remember, he supposed to be bringing me one." GONDO and CI-1 discussed how he may not have brought the "other one." Investigators believe that GONDO and other police officers on the scene had located

a handgun that the male normally carries, but that this male was supposed to have been bringing a second gun to give or sell to CI-1 and the second gun had not been located.

23.     According to the camera timestamp, at approximately 1:22:17 p.m. the camera swings into view and an individual, who your affiant believes is GONDO is standing on the sidewalk next to ██████ passenger door and has his right hand next to his ear.   Another officer is bent inside the vehicle.   Your affiant believes that GONDO is likely on the telephone with CI-2.

24.     Your affiant has reviewed the Statement of Probable Cause which was submitted to the State's Attorney's Office of Baltimore City, supporting the arrest of ██████ In the probable cause statement, GONDO reported that "at 1315hrs" members of the Gun Trace Task Force (GTTF) conducted a traffic stop in the 3000 block of West North Avenue, Baltimore, Maryland because the vehicle was "following a silver van too closely at an unsafe distance."  The statement continued that the GTTF members were in an unmarked vehicle "containing: Stg Allers driver, Det(s) Hersal front passenger and Rayam, Gondo Rear passenger." The report further stated that after the vehicle was stopped, and as Detectives Hersl and Rayam approached the vehicle, Hersl observed ██████ "reaching from his right pants pocket, placing a small caliber firearm into a Camouflage back pack." The statement continues that, "Mr. ██████ was immediately placed into custody for officer safety." Detective Hersl then recovered the firearm along with additional ammunition from inside of the backpack. ██████ was subsequently arrested and charged.  The items seized were a "Davis Industries Chinco DM 22. Caliber pistol serial #310824 loaded with (2) live .22 Caliber rounds, Box of .22 Caliber 40GR Jacketed Hollow point rounds.   Total rounds (22) in box, and a Camouflage Back Pack."

25.     On May 11, 2016, at approximately 9:50 p.m., ██████ placed a telephone call to telephone number (443) 617-3670, a number associated through public records with ██████

31

████████████████ a landscaping company that ████████ owns. While the call was

connecting, the automated jail call system requested that the caller state their name and ████████

replied, ████████ According to the jail call system, the call was placed from Central

Bookings, the processing center for people arrested in Baltimore City. A female, believed to be

████████████████ based on the context of the conversation, answered the telephone.

████████ asked if ██████ was okay and she said she was and that she was at "Matt's." ████████

asked what was going on and ████████ said that he has to see the Commissioner. ████████

asked, "What did the cops say, I think he said it was unlawful use or unlawful possession or

something." ████████ replied, "Well, first of all, I mean, I'm kinda talkin' to Matt about it. He's

not going to say anything. First of all, they didn't read us our rights, so I hope you didn't sign any

Miranda rights." ████████ said, "I didn't sign anything. He took a video." ████████ said in the

background, "He didn't sign anything Matt" and then ████████ continued to ████████ "Second of

all, he didn't even search me. They pulled me out of the car, they never even called the lady cop

over to search me whatsoever, so what did they have rights to come to the passenger side and pull

you out and search the car." ████████ replied, "Well you know it was because, don't say any

names, it was because of what's her face [CI-1] snitched on us." ████████ said, "That's what I'm

thinkin'. That's what Matt said. Somebody knew you had it [a gun], you were comin' into

Baltimore, and I mean, just the way it went down." ████████ asked, "You didn't hear from her

[CI-1] afterwards, did ya?" ████████ replied,"Yeah, yeah, she [CI-1] texted me and was like where

are you guys?" ████████ continued, "They're [the police] tryin' to say I was too close to that van. It

doesn't make any sense 'cause the cop was behind the van. They gave me a hundred and ten

dollar ticket for being too close to the bumper of the van. Now that van didn't have lights on or a

blinker." ████████ continued, "Now how can I be tailgating when you guys pulled me over when

you were behind the van."

26.     A little later in the call, ██████ said, "And hey, what happened to your money?" ████████ replied, "They [the police] said they gave it to you." ████, responded, "No. That's a downright lie.   They gave me my wallet with the money that was in my wallet. Your wallet was completely ransacked.   They never gave me anything." ████████ said, "No, it was in my pocket" and ████ said, 'Ok, so you have the money on you." ████████ replied, "No! It was in my pocket.   It was the first thing they [the police] took out when I got out of the car." ████ said, "Well then it's gotta be in your, like in the bag or something." ████ said, "So they didn't take any of my money out of my wallet, but I kinda, I didn't look through anything else 'cause my car was so destroyed I just put everything back together and just threw everything back in, you know, your area.   I didn't.   I looked through your wallet though and there was no money in it." ██████ said, "I don't keep it in my wallet, it was just in my pocket in a money clip." ████ said, "I didn't see any money clip." ████████ asked, "Did you meet up with them afterwards so you could get my camo bag back?" and ████ replied she did but she didn't see the bag.

27.     Later in the call, ████ asked, "Was there a round in the chamber?" and ████████ replied, "There was two rounds in it.   He asked me how to open it and handed it to me and let me open it.   He had me unload the gun."

28.     Your affiant believes that the above described telephone calls between CI-1 and GONDO, the camera footage, and the recorded jail call, clearly show that they had conducted the traffic stop, officers had conducted a pat down of ████████ who was the passenger, and not located the handgun.   Your affiant believes this is inconsistent with the statement of probable cause.   In addition, your Affiant have not located a record of a money seizure, and according to

33

the conversation between ███████ and ████████, the money had been taken out of his pocket and

not given to ██████

## NEED FOR INTERCEPTION

29.     I believe that the interception of visual, non-verbal conduct within the Target

Location will enable the government to further the goals and objectives of the investigation.

Specifically, these goals and objectives include:

    a.  Discovering the full scope and identification of key personnel involved in the illegal

        activities;

    b.  Discovering the management and disposition of proceeds generated by the

        organization's illegal activities; and

    c.  Obtaining admissible evidence that will demonstrate beyond a reasonable doubt that

        the GONDO, RAYAM, the other identified Violators and any later identified targets,

        committed the alleged violations of law set forth herein.

30.     Interception of visual, non-verbal conduct within the Target Location is necessary

in this matter because normal investigative techniques have been tried and have failed to fully

achieve the goals and objectives of this investigation, or appear reasonably unlikely to succeed if

tried, or are too dangerous to be tried.

31.     The following is a list of investigative techniques that have been used or considered

thus far in this investigation.   Details about the use of each technique with regard to GONDO,

RAYAM, and the other Target Subjects, the success or failure of the technique, and what the

technique has accomplished or failed to accomplish with regard to the goals and objectives of this

investigation are discussed.   When a technique was not employed, an explanation is also

included.

## Wire Taps

32.     As described in the Prior Applications section, there have been a series of wiretaps

conducted in this investigation.   Telephone utilized by SHROPSHIRE have been subject to wire

taps, but they provided limited evidence and information about the criminal activities of the

co-conspirators.   SHROPSHIRE was very cautious on the telephone and although, he was

intercepted speaking to WELLS, they did not openly discuss any criminal conduct.

SHROPSHIRE uses multiple telephones and changes them frequently.   In one case, by the time

County investigators got authorization to intercept one of his telephones, he had stopped using it.

On March 31, 2016, SHROPHIRE discovered a GPS device that had been placed on his vehicle by

County investigators.   Although he called GONDO about it, they switched to Apple's Face Time

function and the content of the conversation was limited.   Your affiant believes they used Face

Time as a precaution to avoid being overheard by law enforcement.   Following this incident,

SHROPSHIRE turned over one of his telephones to a "street lieutenant" who continued to use the

telephone to distribute narcotics on SHROPSHIRE's behalf.   There have been no known

telephone contacts between SHROPSHIRE and RAYAM or any other members of the GTTF.

33.     One of GONDO's two identified telephones has been subject to a wiretap since

April 28, 2016.   Although interceptions have resulted in some evidence regarding his criminal

activity as outlined about, they have not revealed the full extent of his relationship with WELLS

and SHROSPHIRE and what role he plays in their drug organization.   As described above,

GONDO made statements to his girlfriend that he was a drug dealer, but he has not participated in

drug related conversations on **Target Telephone 13**.   Also as described above, although GONDO

and RAYAM discussed stopping the Honda Accord if they see it again, they did not outline what their intentions and in tour affiant's opinion, they appeared to have an existing and unspoken understanding about why they would stop the vehicle.

34.     It is your Affiant's opinion, that SHROPSHIRE, WELLS, GONDO, and RAYAM, are knowledgeable enough about law enforcement techniques to be cautious while speaking on the telephone and although investigators are gathering some evidence from wire taps, it is unlikely that the full scope of the criminal activity will be revealed from wire taps alone.

<u>Pen Registers, Trap and Trace Devices, and Toll Analysis</u>

35.     A pen register identifies the numbers dialed during an outgoing call from a subject telephone, and a trap and trace device identifies the telephone number of any telephone that has dialed the subject telephone.   This information is useful because the subscriber information obtained from those numbers can potentially help to identify the physical location of the telephones in contact with the subject telephone, as well as the identity of the subscribers to those telephones.   A pen register and trap and trace device, however, confirms the fact that there is contact between two telephones, but cannot identify the nature of that contact.

36.     Court orders have been issued authorizing the installation and use of a pen register and trap and trace device on phones used by GONDO, RAYAM, and WELLS.   Call detail records have also been obtained for telephones used by GONDO, RAYAM, WELLS, and ███████   Telephone toll records, pen registers, and trap and trace devices will continue to be used in this investigation; however, they provide only limited information.   For instance, between January 1, 2015 and March 31, 2016, there were 90 contacts between GONDO's and SHROPSHIRE's known numbers and 328 contacts between GONDO's and WELLS' known numbers.   However, the records for these contacts do not reveal the nature or content of the conversations.

37.     Subscriber and telephone billing information has also been of some use in identifying persons who may be involved in illegal activity, but only to a limited extent.   Among other limitations, billing records are supplied to law enforcement officers by service providers of various telephones believed to be used by the target subjects after the calls are made, and as a result, those records cannot provide "real time" information about the calls that are being made. Additionally, there is often a significant time delay in obtaining subscriber data, which can make this information ineffective as a timely investigative tool.   Moreover, like the information gathered from pen registers and trap and trace devices, toll records only serve to confirm the fact that there has been contact between two telephones or between a telephone and a paging device. Toll records do not provide "real time" information regarding the contact (i.e., as the events are occurring).

38.     These methods do not enable law enforcement officers to identify, with certainty, the persons involved in the conversations, or the significance of the communications in the context of ongoing narcotics trafficking and or money laundering activities.   Pen registers cannot be relied upon to accurately record the identity of the parties to the conversation, or identify the nature or substance of the conversation, or differentiate between legitimate calls and calls for criminal purposes.   Because of the use of cellular telephones and fictitious subscriber information, pen registers and trap and trace devices are often useless in determining the physical location of incoming telephone calls.   In addition, many times, the incoming telephone is not registered and consequently cannot be identified.

<u>Confidential Sources</u>

39.     While law enforcement will continue to collect evidence from confidential sources, its usefulness is limited.   Information supplied by confidential sources has been limited to

historical information like Officer-1's information from 2013 because Officer-1 is no longer in contact with GONDO or RAYAM.   Your affiant believes that GONDO, WELLS, and SHROPSHIRE have known each other since they were young.   GONDO and RAYAM have been working together for years and interceptions over **Target Telephone 13** have verified that they are very close and have a high level of trust with each other.   GONDO and RAYAM are police officers and because of their positions as members of law enforcement, they are likely to be especially cautious.   GONDO and RAYAM have operated and are currently operating confidential informants as part of their official duties and therefore, have extensive knowledge about the technique.   Even if a confidential informant was successfully introduced, it would be highly unlikely that GONDO or RAYAM would trust them and they would have only a small window into GONDO and RAYAM's activities.

40.     County investigators have developed and utilized several confidential informants during the course of their investigation into ANDERSON, SHROPSHIRE, and members of SHROPSHIRE's drug trafficking organization.   These confidential informants have been able to provide some phone numbers of members of the organization and these confidential informants have participated in controlled purchases of narcotics.   The information and actions of these confidential informants have assisted County investigators with obtaining wire taps on telephones used by SHROPSHIRE and his associates, but none of these confidential informants have provided any information about GONDO, RAYAM, or any other members of the GTTF.

41.     Since December 2015, three associates of SHROPSHIRE and WELLS who participate in drug trafficking and street level distribution of drugs have been arrested and charged with Federal narcotics violations.   None of them have cooperated and all three remain in custody.   County investigators have monitored some of their jail calls and based on the

content of the calls, none of them appear to be receptive to cooperation.    Your Affiant has no

knowledge of any possible confidential informants within the center of the organization or who

could infiltrate the organization and identify all the co-conspirators and, in particular, identify all

other individuals being contacted by the target telephones.

42.    The value of trial witnesses who are confidential informants can also vary

significantly.    Testimony by these witnesses ordinarily must be corroborated by other means.

Information provided by confidential informants would likely not, without the evidence available

through the requested interception of   visual non-verbal conduct, result in a successful

identification and prosecution of all participants in the conspiracy.    Your Affiant believes that

information provided by the confidential informants would not, without the evidence available

through the requested interception of   visual non-verbal conduct, result in a successful

prosecution of all participants.

<u>Undercover Agents</u>

43.    As a result of my training and experience, and the information obtained during the

course of this investigation, I do not believe that undercover agents can achieve the goals of this

investigation.    If such an approach is even possible, it would be very difficult and

time-consuming to introduce an undercover employee into this investigation.    It would also

require a tremendous amount of both federal and state resources.    In order to introduce an

undercover employee into this investigation, a relationship would have to be established with

GONDO and RAYAM.    There also exists a high probability that GONDO and RAYAM are

familiar with this technique (not to mention the other law enforcement techniques listed herein),

thereby jeopardizing the investigation and placing the employee in danger.    For instance, during

an intercepted telephone call on **Target Telephone 13,** RAYAM and GONDO discussed how

HERSL had been called down to BPD Internal Affairs for an unknown reason.   During the conversation, GONDO and RAYAM wondered if their office could be bugged and whether HERSL was or become an informant for Internal Affairs.

44.   Despite the above risks, an operation is planned that will employ two FBI undercover agents who will attempt to "bump" GONDO at one of the Washington D.C. night clubs that he frequents.   The undercover agents, who will be portraying drug traffickers from out of state, will attempt to engage GONDO in social talk with the hope of turning the conversation to narcotics related topics.   Even if the undercover agents are able to engage in conversation, it is unlikely that in an initial encounter, GONDO will discuss his criminal activity and even if he does, it will likely be limited in nature.   Additionally, it will be a lengthy in time and difficult to develop the trust and credibility with total strangers that could result in the controlled purchase of narcotics from GONDO or his associates.

Mail Cover Request

45.   "Mail covers" are a service provided by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained.   The list is compiled by the mail carrier who would deliver the mail to the target location, and then the list would be provided to a United States Postal Inspector, who would provide the list to your affiant.   Your affiant has not discovered information which leads him to believe that a mail cover at the residence of GONDO would achieve the goals of this investigation or provide any evidence of criminal conduct.   There is no indication from any source in this investigation that GONDO is using the regular mail to conduct drug trafficking or protection of SHROPSHIRE's DTO.   Further, your affiant is not certain that the mail carrier could be relied upon to perform this task without compromising the investigation (unwittingly or

otherwise) and alerting GONDO that he is being watched or investigated.   Therefore, the risks of pursuing this investigative technique far outweigh the value.

### Interviews/Grand Jury/Subpoenas

46.     Interviews have generally not been conducted during the course of the investigation.   In October 2015, ANDERSON was interviewed and then cooperated in a limited way as described above, but he was found to be less than forthcoming and has stopped cooperating.   ANDERSON's girlfriend, Cousin, was very hesitant to speak with the FBI and did so only after several requests.   Cousin's information was limited to the home invasion and she was not able to identify the perpetrators.   ANDERSON and Cousin did not provide any information about GONDO, RAYAM or any other members of the GTTF.   Also, as described above, since December 2015, three associates of WELLS and SHROPSHIRE have been arrested by County investigators.   None have cooperated or provided any information to law enforcement.

47.     At this time, interviews would also have the effect of alerting the Target Subjects and others, thereby compromising the investigation and resulting in the possible destruction or concealment of evidence.

48.     Furthermore, your affiant, based on my training, knowledge and experience, knows that interviews with individuals involved in trafficking narcotics and contraband are generally not productive because of the individuals' fear for their physical safety.   In this case, GONDO, as a police officer, wields a tremendous amount of authority and has shown a willingness to use it for improper motives.   Therefore, GONDO could easily intimidate witnesses with threats.   Moreover, I believe that many of the witnesses in this investigation

41

could choose not to speak with law enforcement, or would provide false information to law enforcement out of fear of retaliation.

49.     Based upon my training and experience, I do not believe a Grand Jury investigation using subpoenas would be successful at this time for the following reasons:

a.  Subjects of the investigation, such as GONDO and RAYAM, if called to testify, would most likely invoke their Fifth Amendment privileges;

b.  It would likewise be unwise to see Grand Jury immunity for any of the subjects as it might foreclose prosecution of the most culpable people; and

c.  Most of the individuals who have been identified in this investigation participate in various forms of illegal activities and would likely lie under oath unless confronted with facts that would force them to tell the truth.

50.     Currently, I am not aware of any person who could be subpoenaed before the Grand Jury or interviewed who would provide significant and truthful evidence to prove the ongoing, suspected crimes identified in this affidavit.   Moreover, the use of Grand Jury techniques, like search warrants described below, would alert GONDO, RAYAM, and their co-conspirators, both known and unknown, to the existence of this investigation.   At a minimum, this would lead GONDO, RAYAM, and their co-conspirators to be more circumspect in their dealings.   Thus, I believe that these techniques, in particular, are likely to impede the government's investigative objectives at this time.

<u>Physical and Electronic Surveillance</u>

51.     As a general matter, physical surveillance is often helpful in verifying an association between various target subjects, in verifying the identity of various vehicles and locations used by the target subjects, and in identifying persons who associate with the target

subjects, but, in and of itself, it rarely succeeds in gathering evidence of the criminal activities under investigation.

52.     GONDO and RAYAM are police officers and trained in various law enforcement techniques, it is difficult and potentially dangerous to perform surveillance on them.   GONDO, who is an investigator with over seven years of experience, has conducted various types of investigations to include narcotics investigations.   As part of their duties, GONDO, RAYAM and ███████ routinely employ surveillance and counter surveillance techniques.   For example, as described in paragraph 14 above, GONDO stated that he had observed the same Honda Accord on three separate occasions in different areas of Baltimore and that he watches all the vehicles as he is driving.   On May 11, 2016, an FBI Task Force Officer attempted to conduct physical surveillance of the enforcement operation that the GTTF conducted on ███████ and ███████   Although the TFO was able to confirm where the incident occurred, he was only able to drive back and forth past the traffic stop, for fear of being observed by the officers who would be operating under a heightened awareness because of the neighborhood they were in and the nature of their activity.   The TFO was unable to observe the search of ███████ or the full search of the vehicle.   Even if the TFO had been able to stay in one position, it would have been very unlikely that he would have seen the theft of the $700. Physical surveillance, while allowing law enforcement to place people at the same location at the same time, would not necessarily reveal whether they all had knowledge of the illegal activity. In this case, in particular, although ███████ ALLERS, and HERSL were present at the traffic stop and participated in the search, your affiant believes that the facts outlined above show that the $700 could have been taken by one of the officers without anyone else knowing it happened. I believe that the requested interception of   visual non-verbal conduct, and the ruse scenario will

help to determine whether members of the GTTF are, in fact, stealing money, which members of the GTTF are participating, which members have knowledge of the illegal activity, and potentially how they conceal the theft and what is done with illegal funds that they acquire.

### Search Warrants/Consent Searches/Trash Pulls

53.   Based on your affiant's training and experience and the experience of the other investigators in this matter, your affiant believes that search warrants would not provide sufficient evidence necessary to determine the full scope of the criminal activities, the various methods being used by the target subjects, and the identities of those involved.   Any search warrants conducted in this matter would only advance this investigative objective if utilized at the end of the investigation.   It is almost certain that the execution of a search warrant on any location controlled by the targets will effectively terminate the investigation without achieving the objective of identifying and obtaining evidence against other participants.   Additionally, any further investigation would be effectively terminated because the targets would be alerted to the government's investigation.   When the investigation is closer to completion of its objectives, the use of search warrants at GONDO and RAYAM's residences may be a valuable tool, but until that time, their use would jeopardize the security and scope of this investigation. For instance, during an intercepted call over **Target Telephone 13**, GONDO directed his girlfriend to a location in his residence where he stored money and in a different call, GONDO represented that he had "stacks" of money. If money ("bait money") is taken from the Target Location, search warrants will be planned as soon as the investigation can be brought to a conclusion and may result in the recovery of some of the bait money.

54.     The analysis of trash discarded from a residence can sometimes be useful in an investigation of a criminal organization.   However, collection of trash of the target subjects would not be optimal tool for furthering this investigation. Further, trash searches are not practical at the residences of the target subject.   GONDO resides in a condominium whose residence place their trash in a centralized location making it impossible to identify which trash belongs to GONDO.   However, if collection was possible and during the attempt investigators were seen by GONDO or by his neighbors attempting to collect trash, it would alert the target subject and jeopardize the investigation.   Interceptions over **Target Telephone 13** have shown that GONDO's neighbors are very aware of activity in the neighborhood.   For example, in May 2016, ███████ vehicle was towed from the parking lot and GONDO and ██████ discussed how it was because the neighbors pay close attention to anything out of place.   More importantly, GONDO is a trained police officer and knows the techniques used in collection of trash and what law enforcement would be looking for in the trash.   In any event, analysis of the target subjects' trash would not necessarily reveal the scope of the conspiracy or the individuals involved in it.

### Post-Incident Search of Winnebago

55.     Audio and video interception is necessary because, without it, law enforcement would be unable to mount a successful prosecution in the event that items are unlawfully taken from the Winnebago.   While law enforcement could conduct an inspection of the Winnebago before the search and a post-incident search of the Winnebago after GONDO and other officers have exited the Winnebago, information from that post-incident search alone would be insufficient to prosecute any of the officers because it would be likely impossible to prove which officer took the money or whether multiple officers were involved in the theft of items from the

Winnebago.   If each of the officers involved in the search of the Winnebago were arrested and

charged with theft, each officer could mount a defense that the government cannot prove that he

took the money and that instead another officer took the money.   Furthermore, it is unlikely that

the officers would use phones to communicate with GONDO about the incident because they

will be with one another and speak face-to-face in real time about their decisions to steal the

money or conduct other unlawful activity. Accordingly, a post-incident search alone is

insufficient to meet the goals of law enforcement's investigation without wire and video

interceptions in the Winnebago.

<u>Financial Investigation</u>

56.   GONDO is employed by the Baltimore Police Department and receives a salary for

his services.   GONDO also works security details at a local college and appear to be receiving

settlement payments for a shooting that he was a victim of in 2006.   The evidence of this income

would not, by any means, achieve the objectives of this investigation.   Also, as outlined above,

GONDO and RAYAM deposited cash into his bank account in the days following the home

invasion which occurred on October 5, 2016.   Although, bank records of these cash deposits have

been obtained, they do not reveal the source of the cash.   Moreover, as discussed elsewhere in this

affidavit, the Target Subject's roles in this conspiracy would not be fully revealed by analyzing

bank records alone.

57.   While credit card and bank records have been subpoenaed and provided limited

information; these types of accounts are not typically used to finance or transfer money in drug

transactions.   Individuals cannot typically transfer money to one another without the use of the

credit card terminal required for standard credit card transactions.   Even if successful, a financial

investigation would not reveal the extent of the Target Subject's sole or identify all

co-conspirators.

<u>CONCLUSION</u>

58.     Based on all of the above, I submit that there is probable cause to believe that the

above-described violations have occurred, are presently occurring, and will continue to occur and

that it is likely that a violation or violations will occur in the Target Location and that normal

investigative techniques have failed to produce evidence necessary to sustain a prosecution of the

aforesaid offenses and reasonably appear unlikely to succeed.

Erika Jensen Special Agent
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED before me this _____ day of June, 2016

Judge Richard D. Bennett
United States District Judge, District of Maryland

I hereby attest and certify on _____
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy

47

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

UNITED STATES DISTRICT COURT      JUN  8 2016
DISTRICT OF MARYLAND

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | UNDER SEAL                    DEPUTY |
| OF THE UNITED STATES FOR AN | ) | |
| ORDER AUTHORIZING THE INTERCEPTION | ) | |
| OF VISUAL, NON-VERBAL CONDUCT | ) | |
| AND ACTIVITIES BY MEANS OF CLOSED | ) | Misc. No. _16 mc 361_ |
| CIRCUIT TELEVISION OCCURRING | ) | |
| WITHIN A 2006 28ft Ford Yellowstone SE | ) | |
| Motor Home, model E-450 Super Duty | ) | |
| Maryland tag ███████ | ) | |
| VIN ████████████████ | ) | |
| | ) | |

ORDER
AUTHORIZING THE INTERCEPTION OF VISUAL,
NON-VERBAL CONDUCT AND ACTIVITIES

Application under oath having been made before me by Leo J. Wise, Assistant United

States Attorney for the District of Maryland, for an order authorizing the interception and

recording of visual, non-verbal conduct and activities pursuant to Rule 41(b) of the Federal Rules

of Criminal Procedure and the All Writs Act (28 U.S.C. § 1651) and full consideration having

been given to the matters set forth therein, the Court finds:

A. There is probable cause to believe that Momodu Bondeva Kenton GONDO, a.k.a.

Momodu GONDO, "GMoney," and "Mike;" Jemell Lamar RAYAM (hereafter the "Target

Interceptees") and others as yet unknown have committed and are committing offenses involving

Title 18, United States Code Section 641 and obstruction of justice, in violation of Title 18,

United States Code, Section 1512 and 1519.

B. There is probable cause to believe that particular visual, non-verbal conduct and

activities concerning these offenses will be obtained through the interception for which

authorization is herewith applied. In particular, visual, non-verbal conduct and activities will

1

concern the theft of money from what the Target Intereceptees believe is a law enforcement search of **2006 28ft Ford Yellowstone SE Motor Home, model E-450 Super Duty Maryland tag** ▮▮▮▮, **VIN** ▮▮▮▮▮▮▮▮▮**, white in color with grey and black designs on the sides and rear and the words Yellowstone SE on the sides, front and rear (hereafter the "Target Location").**

C. Normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried or continued, or are too dangerous.

D. There is probable cause to believe that Target Location is being used by Target Interceptees and others as yet unknown, in connection with the commission of the above-stated offenses.

WHEREFORE, IT IS HEREBY ORDERED that the United States Department of Justice Federal Bureau of Investigation (FBI) is authorized, to intercept and record the visual, non-verbal conduct and activities of the Target Interceptees and others as yet unknown, concerning the above-described offenses at the Target Location. Such interception shall not terminate automatically when the type of conduct/ activity described above in paragraph (B) has first been observed but shall continue until the conduct or activity is intercepted that reveals the manner in which (name the interceptees), and others as yet unknown participate in the specified offenses and reveals the identities of (his)(their) coconspirators, their methods of operation, and the nature of the conspiracy, or for a period not to exceed 8 days, whichever is earlier.

PROVIDING THAT, this authorization to intercept visual, non-verbal conduct and activities shall be executed as soon as practicable after the signing of this order and shall be conducted in such a way as to minimize the interception of conduct and activities not otherwise

subject to interception, and must terminate upon attainment of the authorized objective or, in any event, at the end of 8 days.

IT IS ORDERED FURTHER that, in accordance with 18 U.S.C. § 3103a(b), notification of the execution of this order be delayed for a period not to exceed ninety days (or some lesser period) because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation. Such period of delay may thereafter be extended by the court for good cause shown.

Date _J U N E  8,  2 0 1 6_

_Paul D. Bennett_

HONORABLE RICHARD D. BENNETT
United States District Judge, District of Maryland

i hereby attest and certify on __6 | 8 | 16__
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy